JAP:PT

**M08-0289**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

MARTHA ALDAZ,
EMILIO MATIAS and
JOHN PAYNE,

        Defendants.

- - - - - - - - - - - - - - - - -X

C O M P L A I N T

(T. 21, U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

    MAN F. TSE, being duly sworn, deposes and says that he is a Special Agent with United States Immigration and Customs Enforcement ("ICE"), duly appointed according to law and acting as such.

    Upon information and belief, on or about and between March 19, 2008 and March 25, 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MARTHA ALDAZ, EMILIO MATIAS and JOHN PAYNE, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a substance containing heroin, a Schedule I controlled substance, in violation of Title 21 U.S.C. § 841(a)(1).

    (Title 21, United States Code, Section 846).

2

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with ICE for approximately five years, and a Special Agent with INS for approximately three years before that. I work with an OCDTEF Strike Force comprised of various federal and New York state law enforcement agencies. My information in this case comes from a review of ICE records, conversations with other law enforcement agents, and my direct participation in the investigation.

2. On or about March 19, 2008 ICE received information from a Confidential Informant, who had proved reliable in the past, regarding a suspicious package sent from Ecuador to the United States via a small air courier company located in Queens, New York. The package was suspicious because the sender listed a return address of Quito, Ecuador on the package, when in fact the package had been shipped from another city in Ecuador. The package was also suspicious because the listed address for the recipient was a determined to be fictitious, and the telephone number listed on the package for the recipient was determined to be a non-working number.

3. Agents with the OCDTEF Task Force asked the courier company to refrain from turning the suspicious package over to

---

[1] Because the purpose of this affidavit is merely to establish probable cause, I have not set forth all of the facts and circumstances of which I am aware.

the intended recipient until agents were notified and could come to that location. The courier company agreed not to turn over the package, and to inform agents if someone inquired about the package.

4. On March 25, 2008 at approximately 11:00 A.M. the courier company informed the OCDTEF task force that someone inquired about picking up the suspicious package. Agents set up surveillance in the vicinity of the courier company's Queen's facility at approximately 12:00 P.M. on March 25, 2008. At approximately 2:30 P.M. on March 25, 2008 agents observed two males, one Hispanic and one caucasian, sitting at a bench at the corner of 53rd Street and Roosevelt Avenue in Queens, staring in the direction of the courier company and waiting. At approximately 3:03 P.M., these two males got up from the bench and entered the courier company. At approximately 3:08 P.M., both males exited the courier company, and the caucasian male was holding the suspicious package. The two males spoke to each other as they crossed the street, before splitting up. After agents identified themselves and asked the caucasian male to stop, the caucasian male attempted to run away. Agents apprehended the caucasian male approximately half a block away, in front of 45-30 51st Street. Agents questioned the caucasian male, who gave his name as JOHN PAYNE, as confirmed by the caucasian male's Massachusetts driver's license. PAYNE also

stated that he was picking up the package for the Hispanic male, who PAYNE said owned the package, and whom he called "Emilio" but whose last name PAYNE claimed not to know. At that time PAYNE was read his Miranda rights and asked further questions. PAYNE made the following statements, in substance and in part: that he met Emilio at work, and PAYNE had told Emilio that he needed money; that on March 24, 2008, Emilio had called PAYNE at PAYNE's residence and said he had a job for PAYNE; that Emilio said during this call that the job consisted of picking up a package for Emilio, and that upon completion of the job PAYNE would receive $2,000; that Emilio met PAYNE at PAYNE's house at approximately 8:30 A.M on March 25, 2008; that Emilio and PAYNE took the subway to Queens, where they were picked up by a female, unknown to PAYNE or Emilio, in a light blue minivan, with a Hispanic male known to Emilio as "Tigre" in the passenger seat; that the light blue minivan took PAYNE and Emilio to the courier company's location; that PAYNE and Emilio inquired about the package at the courier company and were told they had to return at about 3:00 P.M. to pick it up; and that after walking around Roosevelt Avenue for a number of hours, they returned to the courier company at approximately 3:00 P.M.

    5. After exiting the courier company, the Hispanic male, identified as the defendant EMILIO MATIAS, walked eastbound on Roosevelt Avenue toward 52nd Street. MATIAS was stopped by

5

agents on Roosevelt Avenue several blocks from the courier company and told by agents that a male fitting his description was involved in a robbery a short distance away, and engaged in conversation with MATIAS. MATIAS provided his United States passport to agents as identification, in the name of EMILIO MATIAS. MATIAS said he was on his way to the Bronx, prior to going to work on Staten Island. When asked, MATIAS could not provide any explanation for why he was in Queens. Agents asked MATIAS if he would consent to drive with agents to a nearby location where the robbery victim could confirm that MATIAS was not the perpetrator. MATIAS agreed and was placed in the agents' vehicle in handcuffs, but was told that this was for officers' safety and that MATIAS was not under arrest. MATIAS was driven several blocks to a "neutral location," where he exited the agents' vehicle and had the handcuffs removed. Agents engaged MATIAS in conversation and still could not provide an explanation for why he was in Queens. MATIAS was asked if he had been with anyone that afternoon, and MATIAS said he was by himself the entire time he was in Queens. Agents asked about MATIAS's "friend with the package." MATIAS disclaimed knowledge of any package. Agents brought the suspicious package to MATIAS, and MATIAS said the package was not MATIAS's package, but was "his" package, meaning the "other guy," or "John."

6. Both PAYNE and MATIAS gave agents consent to search the package. Agents opened the package and found a styrofoam cooler within layers of black tape and clear plastic tape. Inside the styrofoam container were four shampoo bottles and woven shoulder bag. Upon removing the shoulder bag and feeling the bottom if it and the weight of the whole bag, it appeared that the bag had a false bottom. At that point, agents found a off-white powdery substance inside the bottom of the bag. A field test of this substance was positive for the presence of heroin. The substance inside of the shampoo was similar to the substance tested from the false bottom of the shoulder bag. The gross weight of this substance 2,122 grams.

7. Agents told MATIAS that he was in a lot of trouble, and MATIAS explained that he understood, he was only involved because he had a pregnant girlfriend in Ecuador, and he was just supposed to oversee PAYNE picking up the package. MATIAS said that once he had picked up the package, he was supposed to call 201-349-2507 in order to make arrangements to pass the package on to the people he had seen in the blue minivan earlier that day. MATIAS then received a phone call from Tigre at 201-349-2507, which call was recorded by agents. MATIAS told Tigre that he had the package and everything was fine, and agreed to speak again to set up a meeting. Approximately thirty minutes later, because MATIAS's wireless phone battery died, MATIAS used

a pay phone to call the 201-349-2507 number. On a call recorded by agents, MATIAS spoke with a Hispanic female, later identified as the defendant MARTHA ALDAZ, whose voice MATIAS recognized as that of the female who drove the blue minivan that morning. MATIAS told the agents that ALDAZ repeatedly asked if everything was alright, or if they were "dirty." After MATIAS convinced ALDAZ that everything was fine, they arranged to go an hour later to the vicinity of Roosevelt Avenue and 90th Street, where she would send a thirteen year old boy to pick up the package.

    8.  Agents proceeded to Roosevelt Avenue and 90th Street and established surveillance of that area. Agents staged PAYNE and MATIAS outside a Dunkin' Donuts on Roosevelt Avenue near the intersection with 90th Street. PAYNE had the suspicious package, with the contents removed, on the ground next to his foot. PAYNE and MATIAS were met on the street by a minor Hispanic male wearing a green cap with a yellow brim. The three of them entered the Dunkin' Donuts and sat at a table, where the minor Hispanic male showed PAYNE and MATIAS cash stuffed in an empty potato chip bag. PAYNE and MATIAS told the minor Hispanic male that the money didn't look right, and asked where the minor Hispanic male's mother was. The minor Hispanic male left the Dunkin' Donuts, as did MATIAS, who waited outside the Dunkin' Donuts entrance while PAYNE remained inside. Soon thereafter, the minor Hispanic male returned to the Dunkin'

Donuts with ALDAZ. The minor Hispanic male entered the Dunkin' Donuts while ALDAZ remained outside and engaged MATIAS in conversation. ALDAZ told MATIAS to give the package to "him," meaning the minor. ALDAZ acted in a nervous manner during the course of her 30-40 second interaction with MATIAS. ALDAZ departed and walked back around the corner, and MATIAS went back inside the Dunkin' Donuts, where PAYNE was counting the money given to him by the minor Hispanic male. The minor Hispanic male exited the Dunkin' Donuts still in possession of the cash in the potato chip bag, with the package still in PAYNE's possession. Agents followed the minor Hispanic male to 40-51 Denman Street, where he was observed speaking to another Hispanic male, bald and in his late 20s, for one or two minutes. An agent entered the lobby area of 40-51 Denman Street and observed this bald Hispanic male, the minor Hispanic male, and ALDAZ speaking to each other. The three individuals exited 40-51 Denman Street, and the two males walked together toward the Dunkin' Donuts. Approximately five minutes later, ALDAZ reentered 40-51 Denman Street. At the time she was entering the building, agents had stopped the minor Hispanic male near the entrance to 40-51 Denman Street at which time another Hispanic male, who identified himself as the minor's brother. Shortly thereafter, ALDAZ exited the building together with a seven-year old male child. Agents then approached ALDAZ and asked where she was going. ALDAZ said she was taking her son

9

back to Long Island. At that time, agents asked her to come with them for questioning, and she agreed.

9. ALDAZ identified herself as MARTHA ALDAZ, as confirmed by a driver's license in her purse. ALDAZ stated that the minor Hispanic male, her half-brother, needed to meet individuals at the Dunkin' Donuts, and she was accompanying him there. She also claimed that the minor Hispanic male had wanted to use her cell phone, and she had asked him why, since he had his own cell phone. When agents asked why the minor needed to use her cell phone when there was a land line in the apartment, she had no response. When asked what she was doing in the apartment, she said she was there because the minor Hispanic male needed a ride somewhere, and she would drive him where he wanted to go. When agents asked if she was concerned about her half-brother meeting strangers at Dunkin' Donuts, she had no

10

explanation. During this questioning, ALDAZ's phone was constantly ringing.

WHEREFORE, your deponent respectfully requests that the defendants MARTHA ALDAZ, EMILIO MATIAS and JOHN PAYNE be dealt with according to law.

                                            MAN F. TSE
                                            Special Agent
                                            U.S. Bureau of Immigration and
                                            Customs Enforcement

Sworn to before me this
26th day of March, 2008

                                            'GE